IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JESSIE GABRIEL GARCIA,

        Plaintiff,

v.                                                                                  CIV 11-0823 KBM

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## **MEMORANDUM OPINION & ORDER**

        THIS MATTER is before the Court on Plaintiff Jessie Garcia's motion to reverse and remand the Administration's denial of disability and supplemental income benefits. *See Docs. 18, 19, 23.* Having carefully reviewed the Administrative Record ("Record") and the parties' positions, the Court grants the motion in part, and remands the matter to the Administration for further proceedings.

        The general issues are whether Administrative Law Judge ("ALJ") William H. Helsper applied the correct legal standards and whether his decision is supported by substantial evidence. A deficiency in either area is independent grounds for remand. *See, e.g., Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir. 2005); *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004). He concluded at Steps 4 and 5 that Plaintiff retained the residual functional capacity to perform sedentary work. The Court must remand, however, because ALJ Helsper did not apply the correct legal standards at Steps 2 and 3 of the analysis. The Court generally agrees with the

well-briefed arguments by Plaintiff's counsel and, unless otherwise noted, incorporates them herein by reference.  To that the Court adds the following observations.

## I.  Tenth Circuit Law Applies

Plaintiff lives in Santa Fe, New Mexico and filed for benefits there.  *See, e.g., Administrative Record* ("*Record*") at 49-51 (initial and reconsideration denials).[1]  ALJ Helsper is stationed in Fort Worth, Texas, and conduced his hearing by videoconference.  *See, e.g., id.* at 10.  The New Mexico case was transferred to ALJ Helsper "for hearing because of a temporary area realignment to expedite" matters.  *Id.* at 77.

Notwithstanding the assignment of this case to an ALJ located in different circuit, the parties do not dispute that Tenth Circuit law applies.  *See e.g., Docs. 19, 22.*  The Court agrees that is appropriate because the claimant and claim wholly lie within this District.  *See Andrews v. Astrue,* Civil No. 08-2116, 2009 WL 4573239 at * 1, n.3 (W.D. Ark. Dec. 1, 2009) (rejecting argument that Tenth Circuit law applied even though "a substantial portion of the administrative proceedings took place in Utah" because "Plaintiff was domiciled in the Western District of Arkansas at the time she filed this appeal, thus making the Western District the proper venue [and since] Plaintiff properly filed in the Western District of Arkansas, the court will use Eighth Circuit law").

## II.  "Duty To Develop Record" Claim Alone Cannot Justify Remand

The hearing transcript does not mention Plaintiff's appointed attorney by name, due to an inaudible portion of the tape.  *See id.* at 23, 25.  The record provides that William Gorton's firm

---

[1]  Documents 14-1 through 14-9 and 15-1 through 15-6 comprise the Record and the Court cites the Record's internal pagination, rather than the CM/ECF document number and page.

in Albuquerque represented Plaintiff during the administrative proceedings from April 2009 through the Appeal Council proceedings. *See, e.g., id.* at 6, 69-71, 75, 109-112, 203-206.

A letter from the Administration and counsel's request for an "on the record" disposition appear to have crossed in the mail. On August 17, 2009, the Administration advised Plaintiff's counsel of claimant's responsibility to provide medical evidence, and provided counsel with a CD of the Administration's current record. *Id.* at 79-80 (letter dated). It directed counsel to submit "[a]ll medical records . . . from one year prior to the alleged onset date to the present and any other relevant medical . . . records not already in [the] file." *Id.* Once "all relevant evidence is up-to-date," counsel was to advise the Administration that the case was ready for a hearing. *Id.* at 80.

On August 18, 2009, Edward Goodman of Gordon's office sent a request for a disposition on the record that explained counsel's position for finding disability. *See id.* at 203-06. Among other things, Goodman noted Plaintiff's "serious" and "longstanding . . . disabling medical conditions including chronic rheumatoid/inflammatory arthritis, gouty arthritis," *id.* at 204, and the severe limitations those conditions proved for standing and walking, *id.* at 205-06. Goodman urged the ALJ to find Plaintiff disabled at Steps 4 and 5, but did not make any listings-level arguments to the ALJ or the Appeals Council. *See id.* at 204-06, 207-14.

The record also does not document whether Gordon or Goodman submitted additional medical evidence after appointment. Most of the medical records are responses to the Administration's requests, and consist of medical services that pre-dated counsel's appointment.[2]

---

[2] *See Record* at 215-44 (Exhibit 1F) (Administration request dated 06/25/08 to La Familia Medical Center, and medical records from 04/28/05 to 01/03/07); *id.* at 245-57 (Exhibit 2F) (Administration request dated 02/16/09 to Sangre De Cristo Wellness Center, and records from 08/14/07 to 02/19/08); *id.* at 258-73 (Exhibit 3F) (Administration request dated 06/05/08 to The Life Link, and medical records from 03/25/2008 to 04/30/2008); *id.* at 274-78 (Exhibit 4F) (Administration request dated 06/05/08 to X-Ray Associates of New Mexico at Santa Fe, and medical records from 05/14/2008 and 05/23/2008); *id.* at 279-339 (Exhibit 5F)

The record also contains some medical records that clearly were not responses to an Administration request. From date of the medical services in these records, which took place after appointment and before the December 8, 2009 hearing, presumably counsel submitted them.³ Counsel did submit records for Dr. Walante services that post-dated the hearing, and the ALJ cited this exhibit in his February 23, 2010 decision. *See id.* at 403-06 (Exhibit 17F) (Gordon firm request dated 12/09/09 to CPNP Dr. Robert Walantes, and medical record from 11/14/09 and x-ray results 11/16/09); *id.* at 14, 18 (citing same). Counsel also evidently supplemented the record with post-decision medical records that reflect a July 21, 2010 surgical procedure. *See id.* at 415-28 (Exhibit 19F) (Dr. David Schulhofer; medical records from 07/21/2010 operation to remove screw from left foot). It does not appear that the Appeals Council considered that evidence before it issued its July 25, 2011 decision. *See id.* at 1-6.

Patricia Glazek, a solo practitioner from Santa Fe, now represents Plaintiff in this appeal. *See Doc. 18.* She faults ALJ Helsper for making a decision on a "substantially incomplete" medical record. *Doc. 19* at 18. She argues that there is additional medical evidence discussing, for example, Plaintiff's rheumatoid arthritis and gout. For almost all of the records cited, counsel relies on either Plaintiff's own recollection and/or gaps in records suggested by inference from the records on file. *See id.* at 18-19. The argument is not based on actual missing records, or a discussion of how their contents would impact the proceedings.

---

(Administration request dated 06/05/08 to St. Vincent Hospital, and medical records from 06/06/2007 to 05/28/2008); *id.* at 340-46 (Exhibit 6F) (Administration request dated 06/05/08 to Dr. David Schulhofer, and medical records from 05/09/2008 to 05/29/2008); *id.* at 353-57 (Exhibit 8F) (Administration request dated 07/28/08 to Santa Fe Imaging LLC, and medical records from 04/10/2007 to 07/28/2008).

³ *See, e.g., id.* at 23 (hearing transcript); *see also id.* at 384-89 (Exhibit 12F) (New Mexico Department of Health records; Dr. Amer's 08/11/09 certification of Plaintiff for Medical Cannabis Program); *id.* at 394-402 (Exhibit 16F) (Dr. Timothy Wetherill; medical records from 05/07/09 to 07/02/09 with copies to Dr. Amer); *id.* at 407-14 (Exhibit 18 F) (Dr. Lyle Amer; medical records and copies from St. Vincent Regional Medical Center from 08/11/09 to 11/09/09).

Ordinarily, an ALJ may rely on appointed counsel to supply any missing evidence and can assume that anything not submitted was deemed irrelevant.[4] Furthermore, appellate counsel's failure to tender the actual omitted records and/or argue how they would have changed the result cannot justify remand on a "duty to develop the record" claim in this Circuit.

> Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record-indeed, to exhort the ALJ that the case is ready for decision-and later fault the ALJ for not performing a more exhaustive investigation. . . .  To do so would contravene the principle that the ALJ is not required to act as the claimant's advocate in order to meet his duty to develop the record. . . .  This is especially true where, as here, neither counsel nor the claimant have obtained (or, so far as we can tell, tried to obtain) for themselves the records about which they now complain-suggesting that counsel has abandoned his role as advocate in favor of relegating that responsibility to the ALJ.  In short, we will not ordinarily reverse or remand for failure to develop the record when a claimant is represented by counsel who affirmatively submits to the ALJ that the record is complete.  This is particularly the case when the missing medical records are not obvious from the administrative record or otherwise brought to the attention of the ALJ.

*Maes v. Astrue,* 522 F.3d 1093, 1097 (10th Cir. 2008).

## II.  ALJ's Inadequate Step 2/Step 3 Analysis

Plaintiff last worked for a glass company from August 2005 through January 2008.  *See Record* at 149.   He testified he was fired because he could not walk, and his employer caught him using a cane.  *See id.* at  28.  Thus, his employment was terminated before his June 2008

---

[4] *See, e.g., Wendelin v. Astrue,* 366 F. App'x 899, 904-05 (10th Cir. 2010 ("where, as here, the claimant was represented by counsel, the ALJ may usually rely on counsel to adequately present the evidence, and 'to identify the issue or issues requiring further development.'") (quoting *Branum v. Barnhart,* 385 F.3d 1268, 1271 (10th Cir. 2004));  *Graham v. Apfel,* No. 97-6373, 1998 WL 321215, at * 3 (10th Cir. Jun. 5, 1998) ("The ALJ could reasonably assume that plaintiff later chose not to submit additional evidence because, perhaps, it was not relevant.") (citing *Shannon v. Chater,* 54 F.3d 484, 488 (8th Cir. 1995));  *Browning v. Astrue,* No. 10-1320-SAC, 2011 WL 5331685, at * 9 (D. Kan. Nov 4, 2011) (citing *Graham*, as well as *Steadman v. Apfel,* No. 97-6373, 1999 WL 76907 at *4 (10th Cir. Feb. 18, 1999), for proposition that when counsel submits evidence after hearing, ALJ can assume additional evidence was omitted because of irrelevancy).

surgery, where three screws were placed in his **left** ankle.  *Id.* at 29.  He also testified that the toe on his **right** foot suffers from gout flares.  *Id.*

Appellate counsel's lack of showing on the duty to develop claim complicates the Court's inquiry, because one set of missing records are from Dr. Ron Press.  Dr. Press was the physician who Plaintiff indicates he saw from April 2007 to May 2008 for, among other things, "chronic left ankle pain," a "handicap placard" and "gout medications."  *See Record* at 151.  An April 2007 x-ray and MRI of Plaintiff's left ankle did not simply show "osteoarthritic degenerative changes . . . underlying inflammatory arthritis [and] crystalline disease," as the ALJ stated.  *Id.* at 11.  Though the x-ray did not reveal any fracture and did reveal degenerative changes, *id.* at 357, the MRI results were a "markedly abnormal MRI of the left ankle," that "raises the specter of underlying systemic process" such that "underlying inflammatory arthritis should be considered as well as crystal disease," *id.* at 356.

Also, Dr. Press is the physician who referred Plaintiff to Dr. David Schulhofer for Plaintiff's first surgery on his left ankle in 2008, *see id.* at 345, something the ALJ noted in his opinion, *see id.* at 12.  Here too, a May 2008 x-ray did of Plaintiff's left ankle did not simply show "talar beaking with narrowing of the talonavicular joint," as the ALJ mentioned.  *Id.* at 12.  It showed, among other things:  an "abnormal morphology . . . in the . . . middle facet" suggesting "partial fibrocartilaginous coalition;" "significant" and "prominent" arthritic changes;" "marked[] hypertroph[y];" "abnormal articulation;"  a "bony fragment which appears loose in the joint," that a prior MRI did not show; "substantial degenerative changes . . . in the talonavicular joint;" and "substantial" and "marked" edema in the navicular."  *Id.* at 276.  The ALJ noted that Plaintiff underwent surgery in June 2008, *see id.* at 13, and presumably Dr.

Schulhofer performed the surgery, *see Doc. 19* at 18, but those surgical records also do not appear in the record.

Even if the Court ignores the incomplete records concerning Plaintiff's gout and arthritis, however, ALJ Halsper's analysis at Steps 2 and 3 still requires remand. The overarching problem is that the ALJ failed to apply the correct legal standards that require him to discuss his Step 3 findings in a nonconclusory fashion, and to consider impairments in combination.

"Step two requires the claimant to establish she has a 'medically severe impairment or combination of impairments.'" *Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005) (citing 20 C.F.R. §§ 404.1520(c), 404.1520a-404.1523). An impairment or combination of them is "severe" if it "significantly limits" the claimant's ability to perform "basic work activities." 20 C.F.R. § 1520(c). Two such "basic" activities are "walking" and "standing." *Id.,* § 1521(b)(1). "Step three asks whether any 'medically severe impairment,' ***alone or in combination with other impairments***, is equivalent to any of a number of listed impairments so severe as to preclude 'substantial gainful employment.' . . . If listed, the impairment is conclusively presumed disabling." *Fischer-Ross,* 431 F.3d at 731 (citing 20 C.F.R. §§ 404.1520(d), 404.1525-404.1526 & pt. 404, subpt. P, App. 1) (emphasis added). The Step 2 and Step 3 findings are based on the medical evidence, yet ALJ Halsper did not discuss any of the medical evidence until ***after*** his Step 3 conclusion, where he reasoned in full: "The claimant has no impairment which meets the criteria of any of the listed impairments described in Appendix 1 of the Regulations (20 CFR, part 404, Subpart P, Appendix 2). No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment." *Record* at 11. Such conclusory treatment of the Step 3 inquiry is insufficient and alone requires remand. *See, e.g., Clifton v. Chater,* 79 F.3d 1007, 1009 (10th Cir. 1996).

The Court will assume for the purposes of argument that ALJ Halsper intended the discussion that followed his Step 3 conclusion to illustrate the basis for his Step 3 finding. Regardless, that discussion does not suffice.

> The determination of medical equivalency at step three must be based solely on medical evidence, 20 C.F.R. §§ 404.1526(b), 416.926(b). Therefore, the ALJ's consideration of Larson's credibility was in error. Moreover, the step three analysis requires a comparison of medical evidence regarding symptoms, signs, and laboratory findings with the listed impairment sought to be established or the listed impairment most similar to the claimant's. 20 C.F.R. §§ 404.1526(a), 416.926(a). The ALJ engaged in no such comparison in this case and failed to even identify the listed impairment to which Larson's impairment was most similar. We conclude the Secretary applied incorrect legal standards and reverse the ALJ's determination on step three.

*Larson v. Chater,* No. 95-2194, 1996 WL 709848, at * 1 (10th Cir. Dec. 10, 1996).

Although ALJ Halsper mentioned the very medical records that in fact diagnosed or treated Plaintiff for arthritis or gout over the years, he also made it plain that he did not believe Plaintiff actually suffers from those conditions. For example, he rejected Plaintiff's testimony that he could only walk a half a block without pain. *See id.* at 15 (discussion of substance of Plaintiff's testimony), *id.* at 17 (finding 4 rejecting Plaintiff's credibility); *id.* at 30-32 (Plaintiff's testimony regarding walking and standing); *id.* at 169 (Plaintiff's report that he can walk 100 feet without pain). He also rejected both of Plaintiff's treating physicians' opinions that Plaintiff's inability to walk was disabling due to his arthritis and gout, because their own records did not provide laboratory results showing an elevated rheumatoid factor and/or uric acid level. *See id.* at 14 (Dr. Amer based his opinion on prior "findings of positive rheumatoid factor and elevated uric acid [but] [t]he [ALJ] notes that there is no objective medical evidence from Dr. Amer to substantiate his findings"); *id.* at 15-16 ("Dr. Schulhofer reported that the claimant's

ankle pain was due to a congenital tarsal coalition and he noted no arthropathy in his left foot. . . . His rheumatoid factor was normal in October 2009").

Also, ALJ Halsper did not mention a specific listing.  "Absent reference to a specific listing or a comparison of the evidence to that listing, the court is unable to meaningfully review the ALJ's decision. . . .  Absent an assurance that the ALJ based his decision solely on the medical evidence, the court cannot conclude that the ALJ's step three analysis was proper." *Bates v. Barnhart,* 222 F. Supp.2d 1252, 1258 (D. Kan. 2002) (and authorities cited therein).  In short, an ALJ's Step 3 determination must be based solely on medical evidence and identify listed impairments.  ALJ Halsper's discussion did not satisfy either criteria.

It is true that Plaintiff's Gordon attorneys did not make any Listings-level argument either in the request for an on-record determination, during the hearing, or after the hearing.  However, the Court finds that this is not a situation where counsel unambiguously and affirmatively waived that argument, such that the ALJ's summary treatment of the Step 3 analysis should be ignored.

> Watson argues that the ALJ erred at step three.  Specifically, she notes that the ALJ failed to "name a single listed impairment that he considered and found that [she] did not meet or equal." . . .  But at the disability hearing, in response to the ALJ's inquiry, Watson's former attorney declared that Watson was not claiming to meet a listing. . . . Although it is generally improper for an ALJ to summarily conclude, as he did here, that a claimant's impairments do not meet or equal any listed impairment, *Clifton* . . . , we discern no error where the claimant's counsel unambiguously concedes the step three issue before the ALJ, *see Hawkins* . . . (stating that "an ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case").  We reject Watson's assertion that accepting her former counsel's step-three concession amounts to some sort of "*post hoc* argument[ ] to salvage the ALJ's decision." Aplt. Br. at 23.  There is nothing impermissibly *post hoc* about recognizing that a claimant has invited the deficiency of which she complains.  *Cf. Robinson v.*

> *Barnhart,* 366 F.3d 1078, 1084 (10th Cir.2004) (stating that *post hoc* attempts to supply possible reasons for an ALJ's decision are improper because they require courts to "overstep [their] institutional role and usurp essential functions committed in the first instance to the administrative process" (quotation omitted)).

*Watson v. Barnhart,* 194 F. App'x 526, 529 (10th Cir. 2006); *see also Gloth v. Astrue,* No. 4:09-00056-CV-NKL, 2009 WL 3837471, at *8 (W.D. Mo. Nov. 17, 2009) (citing *Watson* and finding claimant "waived the argument that her impairments meet or equal a listing" because during the hearing "the ALJ asked Plaintiff's attorney, 'Is your client contending her condition meets or medically equals any of the criteria contained in the listing of impairments?' [and] Plaintiff's attorney responded, 'No, ma'am.'").

The Commissioner argues that the ALJ did not err by ignoring gout at Step 2 because the Tenth Circuit's decision in *Dray* holds that no Step 2 error occurs if the ALJ "finds that at least one other impairment is severe," Doc. 22 at 4, and, alternatively, that the ALJ explicitly discussed the condition anyway, *id.* at 5. Neither argument is persuasive. *Dray* involved a situation where the condition omitted at Step 2 as nonsevere was considered at Step 4, and there was no argument, as there is here, about Step 3. *See Dray v. Astrue,* 353 F. App'x 147, 149-51 (10th Cir. 2009). Second, as just discussed, the ALJ here mentioned the medical records that support the condition but essentially decided Plaintiff did not suffer from it. That outright rejection of a condition that Plaintiff asserts affects his *right* foot, has additional consequences for the Step 3 analysis.

The Commissioner argues that Plaintiff fails to show he falls within a listing because he must be unable to "effectively ambulate" and the "medical record shows that Plaintiff has normal motor response, no pedal edema, and a normal gait." Doc. 22 at 6. In this Circuit, a Step 3 error is harmless if this Court can "confidently say that no reasonable administrative

factfinder, following the correct analysis, could have resolved the factual matter in any other way," *Fischer-Ross,* 431 F.3d at 733-34 (internal quotations omitted), and that "the ALJ's confirmed findings at steps four and five of his analysis, coupled with indisputable aspects of the medical record, conclusively preclude Claimant's qualification under the listings at step three," *id.* at 735.[5] That is not the situation here.

First, ALJ Halsper's rejection of gout as an unsubstantiated impairment contradicts the applicable regulations.[6] The Listings recognize that various immune system disorders can be disabling, including autoimmune disorders such as inflammatory arthritis. *See* Listing Pt. 404, Subpt. P, App. 1, §§ 114.00 A.2, D.6 (2009). "***Generally, but not always,*** the diagnosis of inflammatory arthritis is based on the clinical features and serologic findings described in the most recent edition of *Primer on the Rheumatic Diseases* published by the Arthritis Foundation." *Id.,* §114.D.6. The Court notes that Chapter 12 of this *Primer,* viewable online, is devoted to "Gout."[7] Thus, gout is a recognized inflammatory condition. Also, the above highlighted and other Listings do not require a positive laboratory test result as the keystone to the presence of the condition. To show an immune disorder the Administration "[g]enerally . . . need[s] [the claimant's] medical history, a report(s) of a physical examination, a report(s) of laboratory findings, and in some instances, appropriately medically acceptable imaging or tissue biopsy reports." *Id.,* § 114.00.B.

---

[5] *See also, e.g., Carpenter v. Astrue,* 537 F.3d 1264, 1269-70 (10th Cir. 2008); *Stokes v. Astrue,* 274 F. App'x 675, 679-80 (10th Cir. 2008).

[6] Because ALJ Halsper issued his decision in February 2010, the Court applies the 2009 version of the Code of Federal Regulations.

[7] The entire version of the 12th edition is available on Google Books. The index and table of contents of the Amazon.com "look inside" feature shows the same subject for the 13th edition, the most recent edition according to the Arthritis Foundation website. *See* http://www.afstore.org/PRIMER-ON-RHEUMATIC-DISEASE-13TH-EDITION.

Second, even assuming for the purposes of argument that ALJ Halsper did not reject these conditions and in fact included them in his Step 3 analysis, reasonable factfinders would disagree whether Plaintiff could ambulate effectively prior to his 2010 surgery. Listings-level disability for immune disorders can be met in a number of ways, one of which is where the claimant's condition results in "persistent inflammation or deformity in one major peripheral weight-bearing joint resulting in the inability to ambulate effectively (as defined in 114.00C6)." 20 C.F.R. § 114.00.D.6.e(I); *see also id.,* § 114.09A.1 ("[p]ersistent inflammation or persistent deformity of . . . [o]ne or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively as defined in 114.00C6.").

Section 114.00.C.6 cross-references yet another section of the regulations – "Inability to ambulate effectively has the same meaning as in 101.00B2b." *Id.,* § 114.00.C.6. This is confusing because § 101.00B2b pertains to musculoskeletal problems in children. Nevertheless, except for changing the reference from an "individual" to "child," the 2009 regulations define "inability to ambulate effectively" in the musculoskeletal sections consistently. That is,

> b. What We Mean by Inability to Ambulate Effectively
>
> (1) Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the [claimant's] ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J [or 101.00J]) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C [101.05C] is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.)

*Id.,* § 101.B.2.b; *see also id.,* § 1.00.B.2.b(1) (same). The musculoskeletal general definitions also give examples of effective and ineffective ambulation:

> (2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, ***but are not limited to,*** the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.,* 1.00.B.2.b(2) (emphasis added).

These regulations suggest, but do not flatly state, that a claimant must use walking devices in both hands to ambulate to meet the listing. Furthermore, the claimant here asserts he has inflammatory conditions in ***both*** feet that make it difficult for him to walk, the medical records support the presence of those conditions, and the ALJ did not at all consider the combination of problems in both the left ***and*** right foot. Common sense suggests that an inability to simultaneously use both feet would extreme consequences for walking. But, "it would be beyond the scope of appellate review" for this Court to make such findings "in the first instance" and "[i]ndeed, any such finding would be an impermissible post-hoc justification for the ALJ's deficient explanation." *Havenar v. Astrue,* 438 F. App'x 696, 699 (10th Cir. 2011). "Under these circumstances," the appropriate course is to "remand to the Commissioner for a proper analysis and further explanation of the step-three decision." *Id.* As the Tenth Circuit recently held in a factually-similar situation:

> The Commissioner asserts that any error in this case is harmless. The Commissioner argues that Ms. Murdock cannot meet Listing 1.02 because she does not have an inability to ambulate effectively, which is one of the requirements for the listing. . . .

The Commissioner contends that the ALJ "found that Murdock could perform sedentary work, which requires standing or walking for 2 hours in an 8–hour day" and "that Murdock may require a walker, but only for long distances." . . . The Commissioner asserts that "[s]uch a finding negates the possibility that Murdock met or equaled Listing 1.02." . . . We disagree.

The regulations explain that "[t]o ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00(2)(b)(2) (italics omitted). The regulations further provide that "examples of ineffective ambulation include . . . the inability to walk without the use of a walker, two crutches or two canes, [and] the inability to walk a block at a reasonable pace on rough or uneven surfaces." *Id.* Finally, the regulations note that "[t]he ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation." *Id.*

Here, the ALJ concluded that Ms. Murdock had an RFC for sedentary work, but qualified the RFC by finding that "[c]laimant may also require a walker to ambulate long distances but not to stand or ambulate for short distances (less than 100 feet)." . . . As Ms. Murdock argues, "the fact that [she] can ambulate short distances without an assistive device does not constitute effective ambulation" and the ALJ "found that [she] needed a walker if she walked more than 100 feet." . . . Ms. Murdock further contends that an "example of ineffective ambulation is the inability to walk a block at a reasonable pace on rough and uneven surfaces. As such, the ALJ's finding, by itself, is evidence of an inability to ambulate effectively." . . . Ms. Murdock concludes by asserting that, "a reasonable administrative factfinder, following the correct analysis, could have found that Murdock could not ambulate effectively." . . .

A distance of 100 feet is not very far. To give perspective to this discussion, the distance between each base on a baseball field is 90 feet. . . . That means that Ms. Murdock would need a walker to walk further than the distance between first base to second base, a distance that in general is much shorter than a city block. . . . If Ms. Murdock is unable to walk a block without a walker, then she has demonstrated the inability to effectively ambulate. The ALJ's finding that Ms. Murdock may require a walker to ambulate for distances greater than 100 feet does not

> "conclusively negate the possibility" that she could meet Listing 1.02. Instead, the finding lends support to Ms. Murdock's position that she does meet Listing 1.02.
>
> The ALJ erred by failing to discuss the evidence and the reasons why Ms. Murdock's knee condition does not meet Listing 1.02. Because there are no findings elsewhere in the ALJ's decision that "conclusively preclude Claimant's qualification under the listings at step three" such that "[n]o reasonable factfinder could conclude otherwise," the ALJ's error is not harmless. *Fischer–Ross,* 431 F.3d at 735. Accordingly, we must remand to the ALJ to make the requisite findings at step three. *See Clifton,* 79 F.3d at 1010. [and in footnote 4]  Because we reverse and remand for additional proceedings at step three, it is unnecessary for us to reach Ms. Murdock's contention that the ALJ erred in assessing her credibility as part of its step four RFC determination. *See, e.g., Clifton,* 79 F.3d at 1010 (remanding for step three error and declining to consider step five error).

*Murdock v. Astrue,* 458 F. App'x 702, 703-05 (10th Cir. 2012).

Wherefore,

**IT IS HEREBY ORDERED** that Plaintiff's motion to reverse or remand *(Doc. 18)* is **granted in part**, and this matter **remanded** to the Commissioner for further proceedings.

**IT IS HEREBY FURTHER ORDERED** that, in light of Plaintiff's surgery after the ALJ's decision, the Commissioner shall reopen the matter to secure and supplement the record with all pertinent medical records past and present, conduct a consultative examination if necessary, conduct a new hearing, issue a new decision that includes the proper the Step 2 and Step 3 analysis, and account for any adjustments necessary to the period of disability given Plaintiff's 2010 surgery.

_____
UNITED STATES CHIEF MAGISTRATE JUDGE